IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE MUHAMMAD,<br><br>　　　　　　Petitioner,<br><br>vs.<br><br>JOE PILKINGTON, Correctional<br>Commander, Delano Modified Community<br>Correctional Facility,[1]<br><br>　　　　　　Respondent. | No. 2:13-cv-00153-JKS<br><br>MEMORANDUM DECISION |

Maurice Muhammad, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Muhammad is currently in the

custody of the California Department of Corrections and Rehabilitation and is incarcerated at

Delano Modified Community Correctional Facility. Respondent has answered, and Muhammad

has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

The California Court of Appeal set forth the factual background of this case as follows:

> The alleged victim was [Muhammad's] wife, I.H., and by the time of trial she had
> tried to have the charges against [Muhammad] dropped. The People's case was based
> largely on pretrial statements made by I.H., eyewitness testimony, and evidence that
> [Muhammad] had abused I.H. in the past.

*Witness Testimony*

---

[1]　　Joe Pilkington, Correctional Commander, Delano Modified Community
Correctional Center, is substituted for Ralph M. Diaz, former Warden, Corcoran State Prison.
FED. R. CIV. P. 25(c).

Sergeant Jennifer Garcia testified that on the morning of the charged offenses, I.H. was scared, crying, and had visible spit on her face.  I.H. reported that [Muhammad] had threatened her by text and telephone messages the night before, and at the parking lot had grabbed her by the hair, spun her around, threatened her, spat on her, and grabbed her purse and ran off.  I.H. reported that in the prior messages, [Muhammad] called her a "whore and bitch.  And then [I.H.] also said that he was going to get her[.]"  While [Muhammad] had I.H. in a bear hug at the parking lot, he said that if he could not have I.H., nobody would, and he yelled about "kicking her ass right there[.]"  I.H. later reported that when her purse was returned, money was missing.  *At the police station,* I.H. received texts and phone messages from [Muhammad], which Sergeant Garcia was able to hear or read, and [Muhammad] stated I.H. would not get her purse back and that [Muhammad] would kill her.  I.H. was visibly afraid, complained of neck pain, and showed the officer a tangled clump of hair.

Two witnesses saw I.H. being attacked.  One saw a man grab a woman and "head bump her," then saw the man grab something off of the woman's shoulder and run off.  The other eyewitness saw the man grab the woman from behind, by the hair, and saw him butt his head "into her forehead."

Detective Dennis Prizmich testified as an expert on intimate partner battering.  Based on his training and experience, he described the "cycle of violence" by which tension between intimate partners repeatedly builds up, the aggressor does a physically or verbally violent act, and then there is a "honeymoon stage where they make up."  Often the victim will downplay the extent of the abuse or wholly deny that it occurs, recanting prior statements and becoming uncooperative with law enforcement.

A peace officer testified that in 2004, I.H. reported that [Muhammad] had punched her in the stomach.  Another officer testified that in 2006, I.H. reported that [Muhammad] chased her in the family law court parking lot.

*I.H.'s Testimony*

I.H. testified she was divorcing [Muhammad] and no longer lived with him.  She worked at the UC Davis Medical Center.  On April 17, 2009, she received several texts and voice messages from [Muhammad], but testified she did not recall them or consider them to be threatening.  She recalled speaking to Sergeant Garcia on that day, but denied telling the officer [Muhammad] threatened her and did not recall saying she had received 50 texts from [Muhammad].[1]  I.H. testified she had not been afraid, and had not told the officer she was afraid.

> FN1.  I.H. had also spoken to Detective *Mary* Garcia about this case, and it appears she confused which officer she talked to at which time.  Because any such discrepancies are not material, we will not attempt to reconcile them.

I.H. denied recalling receiving specific texts, including but not limited to the following texts copied from her phone by a peace officer: (1) "'Slut ass stank bitch.  Hate your whore ass.  Allah is gonna destroy your ass.  I hope you and [your] mismatched children die, slut bitch.  Kamelion 8:41 am[;]'" (2) "'San Leandro Bitch hug: Lying cop

-2-

calling slut!  Disrespect breeds disrespect [you] piece of shit sorry whore!  Fuck [you] and I appreciate [your] help prostitute.  Kamileon 8:49 am[;]'" and (3) "'Die bitch. Die!'"

I.H. admitted that on April 17, 2009, she did not park in her usual parking structure, to prevent [Muhammad] from knowing whether she was at work, but denied she had been afraid of him.  She saw [Muhammad's] vehicle driving toward the parking structure, but "just kept walking" to work.  [Muhammad] called out to her, got out of his car, walked fast toward her, pulled her around to face him, and tried to kiss her.  I.H. denied telling Sergeant Garcia that she tried to run away, that [Muhammad] pulled her by the hair, or that she had been afraid.  I.H. conceded that [Muhammad] had called her a "bitch" and a "whore" and sprayed her with saliva while he talked, but denied that he purposefully spat at her or that she told Sergeant Garcia he had done so.  [Muhammad] took her backpack, but I.H. denied reporting that he ripped it off her shoulder.  Later that day, a friend returned the backpack, but I.H. denied recalling reporting that money was missing.

While she was at the police station that day, I.H. received a telephone call from [Muhammad], but she denied that he said anything like "'I'm going to kill you, bitch[.]'"  She denied telling the police that [Muhammad] caused her a headache or neck pain, or showing the police where he had pulled some of her hair out in clumps.

I.H. denied she had applied for a restraining order against [Muhammad] that day, but eventually conceded she signed such an application that had been filled out by somebody else.  She also conceded she had obtained a prior restraining order against [Muhammad] in 2006.  In her application for the earlier restraining order, she stated [Muhammad] struck her in the face, and she testified he had done so.  She denied [Muhammad] punched her in the stomach in 2004 and denied recalling that he chased her around the family law court parking lot in 2006.  She admitted trying to get the present charges dismissed, and trying to reconcile with [Muhammad] in June 2009.

*People v. Muhammad*, No. C068493, 2012 WL 3026387, at *1-2 (Cal. Ct. App. July 25, 2012).

Muhammad did not testify at trial.  On May 2, 2011, after deliberating for less than half an hour, a jury convicted Muhammad of stalking, making criminal threats, false imprisonment, robbery, and spousal battery.

On May 31, 2011, Muhammad filed a *pro se Marsden* motion requesting the substitution of counsel.  *See People v. Marsden*, 465 P.2d 44 (Cal. 1970) (holding it was error for the trial court to deny a defendant's motion to relieve his court-appointed attorney without holding a hearing to allow the defendant to explain its grounds).  Muhammad argued that trial counsel: 1) failed to ask for a curative instruction that Muhammad's Islamic faith should have no bearing

on jury deliberations after the trial judge mentioned the capture and death of Osama bin Laden just prior to jury deliberations; 2) failed to confer with him about trial strategy; 3) failed to subpoena favorable witnesses and effectively cross-examine one witness; 4) failed to adequately investigate before trial; 5) failed to "have a defense" at a preliminary hearing; 6) failed to present any expert witnesses; 7) failed to file a motion for dismissal and a motion to suppress other uncharged allegations made against him; 8) failed to impeach witnesses for the prosecution; 9) failed to present to the court a 13-page document from I.H. exonerating him; and 10) failed "to declare prejudice" with respect to prior uncharged crimes that were admitted.  Muhammad filed an additional "notice of motion and motion for substitution of counsel to file new trial motion or writ of mandate."  After a June 10, 2011, hearing on the motions, the court concluded that Muhammad had made an insufficient showing that defense counsel's representation fell below the requisite standard of competence.  The court stated, "I'm going to find there's not been a prima facie showing, so I'm not going to appoint an attorney to make a motion for you for a new trial."  The court concluded: "You've been caught.  You want out of it.  You're trying to do everything you can to get out of it.  I don't find any error in your representation, in your trial and anything that happened.  So I'm going to deny your motion as untimely in simply attempting to defer the consequences of this conviction[.]"  The court then sentenced Muhammad to 7 years' imprisonment.

On October 31, 2011, Muhammad filed a counseled appeal to the Court of Appeal, arguing that: 1) there was insufficient evidence to support his convictions for stalking and criminal threats; 2) the trial court erred in admitting evidence of intimate partner battering; and 3) the imposition of consecutive sentences violated state law.  Appellate counsel did not raise

any ineffective assistance of counsel claims.  The Court of Appeal unanimously affirmed

Muhammad's judgment of conviction in a reasoned, unpublished opinion on July 25, 2012.

*Muhammad*, 2012 WL 3026387, at *8.

On February 16, 2012, Muhammad filed a *pro se* petition for writ of habeas corpus with

the superior court.  Muhammad argued that: 1) the People suppressed a U.C. Davis surveillance

video of his interaction with I.H. in the parking lot as well as a videotape of a U.C. Davis police

interview of I.H. which would prove "that he didn't commit any crime whatsoever"; 2) the trial

court failed to resolve his motion for a new trial; 3) on the second day of trial, the court informed

the jury that the U.S. government had captured and killed Osama bin Laden, which was

"extremely prejudicial" because Muhammad is a "devout Muslim" who stood accused of making

"terrorist threats"; 4) he was denied his right to be judged by a jury of his peers because there

was only one African-American man on the jury, that juror was elderly, and there were no

Muslims or African-American women on the jury; 5) trial counsel was ineffective for failing to

request the allegedly exculpatory videotapes, for failing to file a *Pitchess* motion[2] to "expose the

unethical practices" of the U.C. Davis police, for failing to file a motion to suppress "hearsay

and false eyewitness testimonies presented by the People," for failing to interview 4 witnesses,

---

[2]	In *Pitchess v. Superior Court*, 522 P.2d 305 (Cal. 1974), the California Supreme
Court recognized that a criminal defendant may, in some circumstances, compel the discovery of
evidence in the arresting law enforcement officer's personnel file that is relevant to the
defendant's ability to defend against a criminal charge.  In 1978, the California Legislature
codified the privileges and procedures surrounding what had come to be known as a *Pitchess*
motion through the enactment of California Penal Code §§ 832.7 and 832.8 and California
Evidence Code §§ 1043 through 1045.  *People v. Mooc*, 36 P.3d 21, 24 (Cal. 2001) (citations
omitted).

and for misrepresenting that the District Attorney had requested a change in judges when in fact defense counsel had requested that change; and 6) appellate counsel was ineffective for failing to raise any ineffective assistance of trial counsel claims on direct appeal.  On February 15, 2012, Muhammad filed a *pro se* "motion for change of judge/disqualification," arguing that the judge who presided over his trial and made the allegedly prejudicial remarks about the killing of Osama bin Laden should recuse himself or be removed from presiding over his superior court habeas petition.  The superior court denied that motion and also denied habeas relief. Muhammad filed a motion for reconsideration which the court also denied.

On May 31, 2012, Muhammad filed a *pro se* petition for writ of habeas corpus with the Court of Appeal in which he raised the same claims that he unsuccessfully raised in his petition to the superior court.  The Court of Appeal summarily denied relief on June 4, 2012.

On June 26, 2012, Muhammad filed a *pro se* petition for writ of habeas corpus with the California Supreme Court, again raising the same claims that he unsuccessfully raised in his previous two state petitions for habeas relief.  The supreme court summarily denied relief on September 26, 2012.

On August 15, 2012, Muhammad filed a *pro se* petition for writ of error coram nobis with the Court of Appeal in which he argued that trial counsel misrepresented that: 1) he would obtain the allegedly exculpatory videotape of his interaction with the victim in the U.C. Davis parking lot and a videotape of the interview by U.C. Davis police of I.H.; 2) he would file a *Pitchess* motion "to expose the acts of moral turpitude on the part of [U.C. Davis] Police"; 3) the state lacked funding to hire expert witnesses to testify on his behalf; and 4) opposing counsel had requested a change in judges when it was really defense counsel who had made the request.  The

Court of Appeal summarily denied relief on August 23, 2012.  On August 31, 2012, Muhammad

filed a second petition for writ of error coram nobis with the Court of Appeal, raising identical

claims.  The Court of Appeal summarily denied relief on September 27, 2012.

On August 27, 2012, Muhammad filed a counseled petition for review to the California

Supreme Court, raising the same claims he had unsuccessfully raised on direct appeal to the

Court of Appeal.  The supreme court summarily denied relief on October 10, 2012.

On April 22, 2013, Muhammad filed a *pro se* "expansion" of his superior court habeas

petition.  He sought to amend his original petition with the additional claim that his conviction

rested on "illegal/false evidence."  Muhammad acknowledged that he called I.H. while she was

being interviewed by the U.C. Davis police and the police listened in on the call with I.H.'s

permission.  Muhammad, however, argued that evidence of that phone call was illegally

procured because he did not consent to the police listening.  Muhammad also filed a writ of

mandate on February 28, 2013, arguing that the trial court judge erred in striking his earlier

motion for disqualification.  On July 19, 2013, the superior court denied Muhammad relief on

both motions.  Muhammad timely filed his Petition with this Court on November 21, 2012, and

Respondent concedes that he has exhausted his claims.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Muhammad raises the following claims: 1) the

People suppressed an exculpatory U.C. Davis surveillance video of his interaction with I.H. in

the U.C. Davis parking lot; 2) the trial court failed to rule on his motion for a new trial; 3) the

trial court made prejudicial remarks to the jury about the capture and death of Osama bin Laden;

4) the trial judge erred under state law in refusing to recuse himself from presiding over

Muhammad's petition for habeas relief; 5) trial counsel was ineffective for a) failing to obtain the allegedly exculpatory videotape, b) failing to interview 4 witnesses, c) failing to file a *Pitchess* motion to "expose the unethical practices of [U.C. Davis] Police who were presenting false evidence and witnesses against [him]," d) misrepresenting that it was opposing counsel who had requested a substitution of judges, e) failing to provide him with unidentified transcripts, f) failing to file a motion to suppress "the hearsay and false eyewitness testimonies presented by the People," and g) failing to ascertain if the U.C. Davis Police officers were qualified under state law to testify; 6) appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel claims on direct appeal; and 7) he was denied his right to a jury of his peers because there was only one African-American man on the jury, that juror was over the age of 60, and there were no Muslims or African-American women on the jury.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### Claim 1: *Brady* violation

Muhammad first argues that the prosecution suppressed a U.C. Davis surveillance video of his interaction with his wife in the parking lot which would show that "it was a mutual and amicable meeting."

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of

the prosecution."  373 U.S. 83, 87 (1962).  There are three elements of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).  Exculpatory evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id*. at 280 (citation and quotation marks omitted).

Muhammad raised this argument in his petition for writ of habeas corpus filed with the superior court.  That court rejected this claim on the grounds that Muhammad failed to show that the videotape existed, that it was exculpatory, and how it would have affected his case.  Muhammad has again failed to show that the videotape exists and that it would have been helpful to his defense.  His *Brady* claim is therefore based on speculation and is accordingly rejected by this Court.  *Id.* at 286 ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review."); *Jensen v. Hernandez*, 864 F. Supp. 2d 869, 911 (E.D. Cal. 2012) (denying petitioner's *Brady* claim where he failed to demonstrate that the medical records allegedly withheld by the prosecution actually existed, that the records were destroyed by police, and that the records would have been helpful to his defense); *see also United States v. Finkel*, 165 F. App'x 531, 533 (9th Cir. 2006) (rejecting *Brady* claim where petitioner failed to show that the evidence existed).  He therefore cannot prevail on this claim.

Claim 2: Failure to rule on his motion for a new trial

Muhammad next argues that the trial court erred under state law in failing to rule on his "motion for a new trial."  Respondent correctly contends that Muhammad fails to assert a cognizable claim for habeas relief.  *See* 28 U.S.C. § 2254(d).  In any event, Muhammad's claim is meritless.  He did not submit a motion for a new trial, but rather a motion for the substitution of counsel and a "motion for substitution of counsel to file new trial motion or writ of mandate." After conducting a *Marsden* hearing, the court concluded that Muhammad failed to make a prima facie showing that his counsel's representation "fell below the level of competence required," and denied his motion "to appoint an attorney to make a motion . . . for a new trial."

Muhammad never complained that there was a breakdown in the attorney-client relationship.  His claim was that he and counsel disagreed over trial strategy.  He sought new counsel to pursue an alternate strategy.  *See Murray v. Schriro*, 746 F.3d 418, 457-59 (9th Cir. 2014) (petitioner not entitled to habeas relief where he disagreed with counsel over trial strategy and did not establish an irreconcilable conflict with counsel).  Therefore, the state court acted reasonably in limiting its consideration to whether counsel provided ineffective assistance in denying Muhammad's proposed strategy and in concluding that rejecting that strategy was not ineffective.  Specifically, the state court did not unreasonably conclude that Muhammad failed to present a basis for a new trial motion and that counsel's failure to move for a new trial was not ineffective.  Muhammad does not challenge the denial of his *Marsden* motion in his Petition before this Court, and he cannot prevail on this claim.

Claim 3: Remarks about the capture and death of Osama bin Laden

Osama bin Laden was captured and killed by the United States in the late evening of May 1, 2011.  On the following morning, prior to starting that day's proceedings, the court allegedly made a "celebratory" remark about that event.  According to Muhammad, the court stated "We got him!  We got that Moslem [sic] terrorist!"  Muhammad claims that the jury went into a "frenzy," and that some jurors "applauded," "yelled and screamed," and that several "gave a standing ovation."  The court's comments were not transcribed by the court reporter and Respondent does not offer any version of the court's alleged statements.  Defense counsel did not object or make a record regarding what was said or argue at trial or on appeal that the remarks prejudiced Muhammad and denied him a fair trial.

During the *Marsden* hearing, Muhammad argued that the court's statements about Osama bin Laden prejudiced the jury against him because Muhammad is Muslim and because there has been an "anti-Islamic sentiment" in America since the 9-11 attacks.  Although the members of the jury had not been made directly aware of his faith, Muhammad argued that they could have inferred that he was Muslim based on his surname which he shares with "the founder of Islam in the world."  Muhammad believed that the court's comments about bin Laden the day after he was captured and killed by the U.S. government caused the jury to return a verdict against him, an African-American Muslim male, within half an hour.  Muhammad suggested that his counsel should have requested some sort of curative instruction after the court's comments, informing the jury that he is Muslim, or probed into jurors' beliefs about Islam during further voir dire. Muhammad additionally stated that the court's statements made him "cringe" because they were insensitive to the death of another human being.  The court acknowledged that it had made a

-12-

comment about Osama bin Laden, but did not restate or summarize its original comments.
Instead, it characterized its statement as having "to do with hoping that on that day there would
also be a remembrance for people who had died in 2011 [sic]."  Defense counsel did not attempt
at that time to make a record of what the court said or give any explanation for failing to request
an instruction or to voir dire the jury.  The court did not further discuss Muhammad's claim that
its comments prejudiced the jury, and, as discussed *supra*, denied Muhammad's motion for the
substitution of counsel.  Muhammad did not appeal the denial of his *Marsden* motion.

Muhammad directly appealed his judgment of conviction through counsel.  Appellate
counsel did not raise any claims regarding the trial court's statement or trial counsel's failure to
adequately respond to those comments on direct appeal to either the Court of Appeal or the
California Supreme Court.

In his *pro se* petition for habeas relief filed with the superior court, however, Muhammad
argued that the court made "inflaming and insensitive" comments which "fatally prejudiced
[him]."  According to Muhammad, "the court made extremely prejudicial remarks under
extremely prejudicial circumstances," and the jury was incapable of setting those comments
aside because trial counsel failed to object to the comments and/or request a curative instruction.
He claimed that he complained about his trial counsel to the state bar association and made
appellate counsel aware of his complaint with trial counsel.  Muhammad claimed that appellate
counsel stated that "he wasn't going to oppose his colleague" by raising any ineffective
assistance of counsel issues on appeal.  Muhammad then complained to the "California
Appellate Program" about appellate counsel's "nonfeasance."  He also apparently filed a motion
to dismiss and for the appointment of new counsel, which the Court of Appeal denied.

-13-

Muhammad also filed a *pro se* motion requesting that the trial court judge recuse himself or be disqualified from presiding over his habeas petition because one of his major complaints was that the trial court made improper remarks which prejudiced the jury against him.  He claimed that he had complained about the judge to the state bar association and the "Commission on Judicial Performance," and that it would be impossible for his trial judge to be impartial in ruling on his plea for habeas relief.

His trial court judge presided over both motions, striking the motion to disqualify him. Citing the California Code of Civil Procedure, the court noted that the fact that a judge has expressed views on a legal or factual issue is insufficient on its own to warrant disqualification. According to the court, if a judge does not disqualify himself, the state code of civil procedure dictates that a party must file a verified statement setting forth the facts supporting disqualification at the "earliest practicable time after discovery of the qualifying facts," and that the party personally serve the judge or his clerk with the statement.  The court additionally concluded that under state case law, when a judge is assigned a habeas proceeding that attacks an underlying criminal proceeding which he presided over, the habeas petition is "deemed a continuation of the underlying proceeding."  The court denied relief, concluding that the motion was untimely because the alleged remarks had been made over a year prior to the filing of the motion and because Muhammad failed to personally serve the judge with the statement of disqualification.

The trial court also denied Muhammad habeas relief, specifically addressing Muhammad's claim that the court made improper remarks about Osama bin Laden.  Again, however, the court did not clarify what it had stated to the jury.  Since the remarks about Osama

bin Laden were outside the record, the court construed Muhammad's complaint as one of ineffective assistance of counsel.  The court first reasoned that Muhammad failed to demonstrate that counsel was ineffective because he did "not attach any documentary evidence to support this claim that the trial court made any comments about bin Laden that were not recorded."  The court additionally reasoned that even if the trial court made such comments,"there [was] no indication that [Muhammad's] religion was known to the jury or any parties or that the charges against him (generally relating to domestic violence) could in any way have been associated with or compared to the terroristic activities of bin Laden."

Muhammad filed a *pro se* motion for the appointment of counsel as well as an amendment to his petition for habeas relief.  The same judge who presided over his trial and first habeas petition again presided over both motions and denied relief.  The court construed Muhammad's amendment as a motion for reconsideration and concluded that although Muhammad had attached a partial transcript of the *Marsden* hearing in which the trial judge's comments about bin Laden were discussed, the transcript did "not support [Muhammad's] claim relating to the statements about Osama bin Laden."  The court reasoned, "It is unclear from the transcripts whether the statements were made on or off the record.  However, even assuming they were made off the record, the transcript indicates that the jurors were not aware of [Muhammad's] religion as [Muhammad] alleged during the *Marsden* motion that counsel should have informed the jurors of [Muhammad's] faith."

Muhammad then filed a writ of mandate with the trial court, which the court construed as another petition for habeas relief.  Muhammad again argued that the trial judge should have been disqualified from ruling on his previous habeas petition and that the judge erred in striking his

motion for disqualification.  The trial court, this time by way of a different judge, concluded that

Muhammad's claims were repetitive or successive or both.  With respect to his claim that the

trial judge should have been disqualified from presiding over his habeas petition, the court

concluded that Muhammad should have appealed the trial court's judgment to the Court of

Appeal, as he was seeking review of that judge's order.  Citing *In re Alberto*, 125 Cal. Rptr. 2d

526, 102 Cal. App. 4th 421 (Cal. Ct. App. 2002), the court concluded that it was not appropriate

for one superior court judge to review a ruling by another superior court judge.[3]  Moreover,

under state law it was appropriate to assign a habeas petition to the judge who presided over the

criminal trial if that judge is available.  Nor was it improper for the trial court judge to strike the

motion for disqualification because a trial judge has the statutory authority to strike such a

motion where it is untimely or discloses no legal grounds for disqualification.  The court

concluded that the motion for disqualification was untimely as the comments had been made

over a year prior to the filing of the motion, and that the trial judge had not been properly served.

---

[3]     In *In re Alberto*, the California Court of Appeal granted a petitioner habeas relief
where the trial judge increased the petitioner's bail based on the judge's belief that the original
judge did not comply with the statutory requirements for departing from the bail schedule,
because the second judge's decision did not comport with California Penal Code § 1289, which
provides that a court may only change bail upon a showing of "good cause."  102 Cal. App. 4th
at 426.  The court concluded that allowing one superior court judge to correct an erroneous
ruling of another superior court judge would place the second judge "in the role of a one-judge
appellate court," and also could lead to forum shopping by parties.  *Id*. at 427-28.  Two
exceptions apply to the general rule prohibiting one trial judge from reconsidering an issue
already decided by a colleague: 1) where the first judge is unavailable, or 2) where the first order
was made through inadvertence, mistake, or fraud.  *Id*. at 430.  Although the second judge could
have changed bail based on a showing of good cause, good cause must be founded on changed
circumstances relating to the petitioner or the proceeding, and not on the conclusion that a judge
previously presiding over bail committed legal error.  *Id*.

Muhammad then filed a *pro se* petition for habeas relief with the Court of Appeal alleging, *inter alia*, that he was fatally prejudiced by the trial court's remarks and counsel's failure to object to the remarks or request a curative instruction.  The Court of Appeal summarily denied relief.  Muhammad filed a habeas petition with the California Supreme Court raising the same issues.  The supreme court summarily denied habeas relief.

Muhammad again asserts in his Petition before this Court that the trial court "made extremely prejudicial remarks under extremely prejudicial circumstances[,] i.e. Bin Laden's death, which the jury was incapable of ignoring nor being prejudicially influenced by." Muhammad argues that the remarks fatally prejudiced him by stirring the passions of the jury and causing the jury to quickly return a verdict against him.

The Supreme Court held long ago that a "fair trial in a fair tribunal is a basic requirement of due process."  *In re Murchison,* 349 U.S. 133, 136 (1955).  "Fairness of course requires an absence of actual bias in the trial of cases."  *Id.*; *cf. Mistretta v. United States,* 488 U.S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship.").  Fairness additionally requires the absence of even the appearance of bias.  *In re Murchison*, 349 U.S. at 136.  "This most basic tenet of our judicial system helps to ensure both the litigants' and the public's confidence that each case has been adjudicated fairly by a neutral and detached arbiter."  *Hurles v. Ryan*, __F.3d__, 2014 WL 1979307, at *15 (9th Cir. May 16, 2014).  The Supreme Court has suggested that due process *may* require recusal where a judge makes comments critical of or hostile to counsel, the parties, or their cases where that opinion derives from an "extrajudicial source," and *will* require recusal if the judge's comments "reveal such a high degree of favoritism or antagonism as to make fair

judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *Berger v. United States*, 255 U.S. 22, 28 (1921) (judge made biased remarks toward German-American defendants where he stated: "One must have a very judicial mind, indeed, not to be prejudiced against the German-Americans in this country.  Their hearts are reeking with disloyalty.")).

Assuming that Muhammad is correct regarding what was said, the judge's comments did not address Muhammad or his case.  The judge's comments were nevertheless poorly timed and ill-advised given that they were made during the trial of an American defendant named Muhammad.  However, they were made the morning after the government finally captured and killed someone generally perceived to be a nemesis of the United States and who had orchestrated the death of thousands of Americans.  The trial court's comments most likely reflected feelings about international terrorism and not Muslim-Americans, and expressed a general relief most Americans felt after learning bin Laden would no longer be a threat to public safety.  Even assuming, as this Court must, that Muhammad accurately restated the court's comments, they cannot be construed as displaying any untoward opinion toward the circumstances of Muhammad's case where he was an American accused of engaging in violence toward his wife and did not pose a larger threat to society.[4]  His circumstances were not by any

---

[4]     While Muhammad's complaints regarding the judge's comments raise a number of issues, the only one that appears to be fully exhausted and preserved is his claim that trial and appellate counsel failed to object and preserve issues regarding the trial judge's comments and possible bias and make an appropriate record.  For the purposes of this decision, this Court will assume the truth of Muhammad's description of what the trial judge said and the response of the jury and any spectators and decide whether trial counsel was ineffective in failing to recognize potential prejudice and take steps to alleviate it and whether appellate counsel was ineffective in failing to preserve the issue of trial counsel's ineffectiveness.

means comparable to those of Osama bin Laden.  Therefore, the judge's failure to *sua sponte* recuse himself did not deny Muhammad a fair trial.

Because the state courts denied Muhammad's claim without holding an evidentiary hearing, this Court may liberally construe his claim as a challenge to the fact-finding process itself.  *See Taylor v. Maddox*, 366 F.3d 992, 999, 1001 (9th Cir. 2004).  The Ninth Circuit has held in "some limited circumstances . . . the state court's failure to hold an evidentiary hearing may render its fact-finding process unreasonable under § 2254(d)(2)."  *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012); *Taylor*, 366 F.3d at 1001.  However, the Ninth Circuit "ha[s] never held that a state court must conduct an evidentiary hearing to resolve every disputed factual question; such a per se rule would be counter not only to the deference owed to state courts under AEDPA, but to Supreme Court precedent."  *Pizzuto v. Blades*, 729 F.3d 1211, 1219 (9th Cir. 2013) (quoting *Hibbler*, 693 F.3d at 1147).

In determining whether the state court's failure to hold an evidentiary hearing rendered its fact-finding process unreasonable, the Ninth Circuit has instructed that courts may turn for guidance to cases considering when a federal district court on habeas review must conduct an evidentiary hearing.  *Hibbler*, 693 F.3d at 1147.  In deciding whether to grant an evidentiary hearing, "a federal court must consider whether such a hearing would enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  It is clear that trial counsel, appellate counsel and the state courts did not consider the trial judge's comments as creating any risk of prejudice to Muhammad and thus did not impose a duty on defense counsel to object, seek a curative instruction, or take any other steps to alleviate prejudice.  The question for this

Court is not whether those legal conclusions were correct, but whether reasonable courts and counsel could reach them.

The fact that the jury returned a verdict within half an hour is problematic.  Nevertheless, while reasonable judges might differ, the state court did not act unreasonably in failing to hold an evidentiary hearing and in implicitly deciding that the jury quickly returned a verdict based on the evidence against Muhammad rather than any passions stirred as a result of what might be construed as a passing, spontaneous comment by the trial judge.  There is no evidence that Muhammad was foreign-born,[5] and the jury was not directly aware of Muhammad's faith.  The domestic violence charges he stood accused of in no way compared or related to Osama bin Laden's scheme of international terrorism.  Moreover, the evidence against Muhammad was overwhelming.  Sergeant Garcia testified that on the morning of the charged offense, I.H. was scared, crying, and had visible spit on her face.  I.H. reported that Muhammad had threatened her and then assaulted her in the parking lot.  At the police station, I.H. received a threatening phone call as well as threatening texts and messages from Muhammad.  The police were able to make a contemporaneous record of these threats.  Two eyewitnesses saw Muhammad head-butt I.H.  The only evidence favorable to Muhammad was I.H.'s recantation, but she was substantially impeached.  She admitted to prior instances of violence by Muhammad against her, that she had not parked in her usual parking structure to avoid Muhammad, and that she applied for a restraining order against Muhammad that day as well as on a previous occasion.  Even if

---

[5]     It appears that Muhammad is an American male who converted to Islam.  In the *Marsden* hearing, he claimed that the jury could have inferred his faith based on his last name, and also stated that it was not his parents' surname.  He seems to have adopted it as an adult as part of his conversion.

Muhammad were able to establish in an evidentiary hearing that the court did make the

comments and the jury and audience responded as he asserts, he still would not be entitled to

relief given the overwhelming evidence against him.  Thus, although the judge's comments were

imprudent, the state courts were not unreasonable in concluding without a hearing that the

evidence, rather than any passion stirred by the judge's comments, caused the jury to quickly

convict him.

Claim 4: Failure of superior court judge to recuse himself from the habeas proceeding

    Muhammad next argues that he was denied due process because the judge who presided

over his trial failed to recuse himself from presiding over his superior court habeas petition in

violation of state law.  As discussed *supra*, the superior court denied relief on procedural

grounds, also concluding that "there [was] no indication that [Muhammad's] religion was known

to the jury or any parties or that the charges against him (generally relating to domestic violence)

could in any way have been associated with or compared to the terroristic activities of bin

Laden."  Muhammad's motion for reconsideration was similarly denied, as was his writ of

mandate, which the court construed as a second habeas petition.

     In claiming that the trial judge should have recused himself or been disqualified from

presiding over his habeas petition, Muhammad relies on arguments previously discussed in this

opinion—namely, the trial court judge's comments about Osama bin Laden.  Muhammad argues

that the Sixth Amendment entitled him to a habeas proceeding before an unbiased judge.  That is

true.  Again, however, although the judge's comments appear imprudent and poorly timed, they

appear to have been spontaneous comments about a significant news event rather than an

untoward comment on Muhammad or his case.  Moreover, it appears that the California courts

could reasonably have concluded that the jury's quick verdict was based on the overwhelming evidence against Muhammad rather than an emotional response to news of Osama bin Laden's capture and death.

Claims 5 and 6: Ineffective assistance of trial and appellate counsel

      A.      *Strickland* standard of review

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Thus, Muhammad must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination"
> under the *Strickland* standard "was incorrect but whether that determination was
> unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is
> a general standard, a state court has even more latitude to reasonably determine that a
> defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland*

claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v.*

*Gentry*, 540 U.S. 1, 5-6 (2003)).

B. Merits

Muhammad argues that trial counsel was ineffective for: 1) failing to obtain the allegedly

exculpatory videotapes; 2) failing to interview 4 witnesses; 3) failing to file a *Pitchess* motion to

"expose the unethical practices of [U.C. Davis] Police who were presenting false evidence and

witnesses against [him]"; 4) misrepresenting a challenge to the previous trial judge, 5) failing to

provide him with unidentified transcripts; 6) failing to file a motion to suppress "the hearsay and

false eyewitness testimonies presented by the People"; and 7) failing to ascertain if the U.C.

Davis police officers were qualified under state law to testify.  He further asserts that counsel

was ineffective for failing to raise ineffective assistance of trial counsel claims on direct appeal.

Muhammad raised all of these claims, except his claim that counsel failed to ascertain

whether the police officers were qualified under state law to testify, in his petition for habeas

review to the superior court.  The superior court denied Muhammad relief as follows:

> [Muhammad] has not shown that the videotaped surveillance exists or what it
> would have shown.  Likewise, although [Muhammad] identifies four potential witnesses,
> he has not attached any evidence of how they might have testified or what effect their
> testimony might have had on the outcome of the trial; in fact, [Muhammad] admits that

he does not have any information about the potential witnesses.  [Muhammad] claims that a *Pitchess* motion would have disclosed "unethical practices" of the [U.C. Davis] police, as evidenced by the abuses committed by [U.C. Davis] Police on the [U.C. Davis] campus in late 2011.  First, Muhammad has not shown that any of the same officers were involved in his case.  Nor has he shown that the misconduct was remotely similar.  Finally, as [Muhammad's] trial occurred in April and May 2011, evidence relating to conduct occurring in November 2011 would not have been available.

Next, [Muhammad] claims that trial counsel misrepresented that the prosecutor challenged the previously assigned trial judge, when in fact defense counsel filed the challenge.  He also claims that defense counsel never gave [him] requested transcripts after promising to do so.  Finally, he argues that counsel stated that he would file a motion to "suppress" hearsay evidence and false testimony, but never did so.  [Muhammad] has not attached any evidence to show that counsel made the misrepresentations.  Moreover, even assuming the allegations were true, [Muhammad] has not shown that any of the misconduct resulted in any prejudice to [his] trial.  Specifically, [Muhammad] does not explain the relevance of *who* challenged the previously challenged trial judge, why the transcripts were necessary, or the legal and factual basis for "suppressing" hearsay or false testimony.

. . . .

[Muhammad] argues that appellate counsel refused to raise "obvious" issues of ineffective assistance of trial counsel . . . .  [Muhammad] has not attached any of the trial transcripts to document the ineffective assistance of trial counsel that allegedly occurred on the record.  Nor does the petition identify the acts or omissions of trial counsel that allegedly constitute ineffective assistance.

As an initial matter, this Court must dismiss Muhammad's claim that trial counsel was ineffective for failing to obtain the allegedly exculpatory videotape because, as discussed *supra*, Muhammad has failed to establish that the videotape ever existed.  His claims that trial counsel misrepresented a challenge to the previous trial judge, failed to provide him with unidentified transcripts, failed to file a motion to suppress with respect to unidentified hearsay, and failed to ascertain if the police officers were qualified under state law to testify must also be dismissed because he has failed to explain the relevance of these alleged acts and omissions and how they might have prejudiced him.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Muhammad additionally claims that counsel was ineffective for failing to investigate and call four witnesses. In his argument, though, he identifies five witnesses that defense counsel should have contacted and called, including Linda Rivera and Marisol Rodriguez, who "were at the scene and would [have] testified that no crimes against the alleged victim took place," Rod Modkins, who I.H. allegedly told that no crime happened, Steve, Muhammad's landlord, who let the police into his apartment in his absence, and Elijah, Muhammad's son, who apparently overheard a phone call about the alleged exculpatory videotape.

The ultimate decision of whether to call witnesses to testify is well within counsel's "full authority to manage the conduct of the [proceeding]." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision . . . to decide not to put certain witnesses on the stand . . . ."). At the *Marsden* hearing, Muhammad claimed that trial counsel failed to call Vicki Randolph and Rod Modkins to testify on his behalf. Defense counsel explained that Muhammad belatedly notified him of these two witnesses and that he was unsuccessful in locating them. Muhammad only had contact information for Modkins, who allegedly had contact information for Randolph. Modkins, however, hung up on a defense investigator on one occasion and also failed to return a voice mail. Defense counsel also believed that calling Modkins to testify would be "dangerous" given that Modkins was going to present a complete alibi and testify that Muhammad was working with him on the day of the incident, which would directly conflict with the victim's testimony that Muhammad was present at the parking lot that day but nothing physical or threatening occurred. Defense counsel also claimed that Randolph would testify that she was having an affair with Muhammad, which would have been cumulative of I.H.'s

testimony on cross-examination.  Defense counsel's decision not to call Modkins to testify was a reasonable tactical decision.  *See Denham v. Deeds,* 954 F.2d 1501, 1505 (9th Cir. 1992) (holding that counsel's decision not to call alibi witnesses because of inconsistencies in the proposed testimony "reflect[ed] the skill and judgment one would expect of a reasonably competent attorney").

It is not clear if Muhammad notified counsel of the remaining four witnesses he now claims counsel should have called; Muhammad did not mention any other witnesses at the *Marsden* hearing, and thus counsel did not have an opportunity to respond to these allegations. Muhammad has not provided affidavits supporting his assertion that Linda Rivera and Marisol Rodriguez would in fact testify that they observed the incident and "no crimes took place," or affidavits from any of the other witnesses.  *See Dows v. Wood,* 211 F.3d 480, 486 (9th Cir. 2000) (denying ineffective assistance of counsel claim where there was no evidence other than petitioner's self-serving affidavit that the witness existed, and petitioner failed to provide an affidavit from the alleged witness).  He has failed to overcome the strong presumption that his trial counsel's conduct fell within the wide range of reasonable professional assistance because he cannot show that the failure to call these witnesses was anything but a tactical decision which this Court cannot second-guess.  *See, e.g., Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial.").

At the *Marsden* hearing, defense counsel also stated that he did not file a *Pitchess* motion with respect to the two U.C. Davis police officers who testified because "[t]here was no indication that they were somehow acting with bias or acting illegally or pressuring [I.H.] to say

anything that day."  Defense counsel argued that the problem was not with the police, but rather

with I.H., who purportedly exaggerated her claims to the police "to get [Muhammad] in trouble."

Counsel "didn't feel a *Pitchess* would ever get [the defense] anywhere."  A *Pitchess* motion

would have failed if there was no evidence of police wrongdoing, and counsel will not be

deemed ineffective for failing to raise a meritless issue.  *Sexton v. Cozner*, 679 F.3d 1150, 1157

(9th Cir. 2012) ("Counsel is not necessarily ineffective for failing to raise even a nonfrivolous

claim, so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless.")

(internal citation omitted); *see also Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor,

J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a

*Strickland* ineffective assistance of counsel claim).

        Although not directly raised in the section of his Petition addressing the ineffective

assistance of counsel, Muhammad argues elsewhere that trial counsel was ineffective for failing

to object to the court's comments about Osama bin Laden and for failing to request a curative

instruction and/or further voir dire the jury about their ability to remain impartial and decide the

case on the evidence.  Counsel may have been deficient in this regard.  Reasonable counsel

might have at a minimum made a record of the court's comments and requested a bench

conference to discuss possible risks of prejudice and possible remedies or courses of action.

None of that was done here.  On the other hand, counsel may have recognized that there was no

reason that the jury would identify Muhammad with Osama bin Laden or his activities.  Further,

counsel may have hesitated to discuss Muhammad's religion with the jurors for fear of

distracting the jurors with speculation about the treatment of women in Muslim countries.

Counsel's strategy was to implicitly concede that Muhammad and I.H. had a confrontation and

to argue that I.H. exaggerated her reports to the police and that her trial testimony more accurately reflected what occurred.[6]  Counsel may have feared that discussion of the Muslim religion would have detracted from this strategy.  Finally, Osama bin Laden and his activities were so different from Muhammad's that prudent counsel might have concluded that reasonable jurors would not identify Muhammad with Osama bin Laden and that to ask them about their feelings might suggest a connection that would not otherwise have occurred to them.  But even if prudent counsel should have done more, it is clear that Muhammad was not prejudiced.  The jury had no direct knowledge of Muhammad's faith, there was no indication he was foreign born or had foreign connections, the charges against him had nothing to do with international terrorism, and, as we have discussed, the evidence against him was overwhelming.

    As discussed above, the majority of Muhammad's ineffective assistance of counsel claims are clearly without merit, and appellate counsel cannot be deemed ineffective for failing to raise such a claim where trial counsel was not constitutionally ineffective.  *Sexton*, 679 F.3d at 1157; *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) ("the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy").  Appellate counsel nevertheless was arguably deficient in failing to raise on direct appeal Muhammad's claims with respect to the trial court's comments and trial counsel's duty to make a record and

---

[6]     The fact that Muhammad was having an affair with Randolph, standing alone, was irrelevant.  The fact that I.H. knew of the affair, as she conceded on cross-examination, was relevant to her state of mind and provided a motive for her initial complaint to the police and explained why she might exaggerate a confrontation she had with Muhammad.  I.H.'s recantation of her complaint and favorable trial testimony including her admission that she sought a reconciliation with Muhammad served to substantiate defense counsel's trial strategy.  Jury speculation about the impact of the Muslim religion on domestic relations would only undermine this strategy.

respond to those comments and for failing to request an evidentiary hearing.  Again, though,

Muhammad was not ultimately prejudiced by appellate counsel's failure to do so because the

overwhelming evidence of Muhammad's guilt and lack of evidence of his faith or international

connections compel the inference that the jury decided the case not on its emotions, but on the

evidence before it.  It was unfortunate that Osama bin Laden was found and killed while this

case was pending, but the state courts could have reasonably concluded that there was no

possibility that bin Laden's death influenced the verdict in this case.

Claim 7: Jury of his peers

Lastly, Muhammad, an African-American Muslim male, argues that he was denied his

right to a jury of his peers because there were no Muslims or African-American women on the

jury, and the only African-American male on the jury was over the age of 60.  He claims that

"[n]one of the jury members had any knowledge of [him] as required according to the legal

definition of 'peer.'"  Muhammad raised this claim in his superior court petition for habeas

relief, and the court concluded that it did not have jurisdiction over the claim because it should

have been brought on direct appeal.

The requirement that a petit jury must be selected from a representative cross-section of

the community is an essential component of the Sixth Amendment right to a jury trial.  *Taylor v.

Louisiana*, 419 U.S. 522, 528-29 (1975).  However, Muhammad does not allege that jurors were

systematically excluded on the basis of age, religion, or race.  *See Berghuis v. Smith*, 559 U.S.

314, 327 (2010) (to establish a prima facie violation of the Sixth Amendment's fair cross-section

requirement, a criminal defendant must show: 1) that a group qualifying as "distinctive" 2) is not

fairly and reasonably represented in jury venires, and 3) "systematic exclusion" in the jury

selection process accounts for that underrepresentation).  Rather, his complaint is that the jury
ultimately chosen did not adequately reflect his personal characteristics and thus could not judge
him fairly.  However, the Supreme Court has expressly rejected the notion that a criminal
defendant is "entitled to a jury of any particular composition" so long as "the jury wheels, pools
of names, panels, or venires from which juries are drawn [do] not systematically exclude
distinctive groups in the community and thereby fail to be reasonably representative thereof."
*Taylor*, 419 U.S. at 538; *see also Powers v. Ohio*, 499 U.S. 400, 404 (1991) (although a criminal
defendant has the right to be tried by a jury whose members are selected by non-discriminatory
criteria, a defendant does not have a right to a petit jury composed in whole or part of persons of
the same race).  Muhammad has failed to allege any factual basis for concluding that the jury
was anything but impartial.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (the Sixth Amendment
guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent'
jurors").  Muhammad is therefore not entitled to relief on this claim.  *See Merced v. McGrath*,
No. C 03-1904, 2004 WL 302347, at *7 (N.D. Cal. Feb. 10, 2004) (rejecting petitioner's claim
that he was denied his Sixth Amendment right to a jury trial when an African-American male
was excused from the jury pool where the petitioner failed to assert that race was a factor in his
exclusion and failed to offer evidence to suggest that other African-Americans were otherwise
excluded from serving on his jury).

## V. CONCLUSION AND ORDER

Muhammad is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ
of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** this Court issues a Certificate of Appealability only with respect to Muhammad's interrelated claims that the trial judge prejudiced the jury with his comments about the death and capture of Osama bin Laden, and that trial and appellate counsel were ineffective for failing to alleviate any potential problems caused by the judge's comments.  This Court declines to issues a Certificate of Appealability with respect to all other claims.  28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004).  Any further request for a Certificate of Appealability as to the other claims must be addressed to the Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 19, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge